**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA**

FILED

MAR 2 0 2018

RORY L. PERRY II, CLERK
U.S. District Court
Southern District of West Virginia

| | | |
|---|---|---|
| ARRIN FARRAR<br>72 Rutland Road<br>Plymouth, Maine 04969 | ) ) ) | |
| | ) | |
| and | ) | CASE NO. _2:18-cv-00461_ |
| | ) | |
| ERIN FARRAR<br>72 Rutland Road<br>Plymouth, Maine 04969 | ) ) ) | |
| | ) | |
| vs. | ) ) | |
| | ) | |
| THE CESSNA AIRCRAFT COMPANY<br>One Cessna Boulevard<br>Wichita, Kansas 67215 | ) ) ) | |
| | ) | |
| and | ) | |
| | ) | JURY TRIAL DEMANDED |
| TEXTRON AVIATION INC.<br>One Cessna Boulevard<br>Wichita, Kansas 67215 | ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| MCFARLANE AVIATION, INC.<br>696 East 1700 Road<br>Baldwin City, KS 66006 | ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| ANDREW SWEPSTON<br>312 Airport Road<br>Gallipolis, OH 45631 | ) ) ) | |
| | ) | |

**CIVIL ACTION COMPLAINT**

1.      This personal injury action arises from March 26, 2016 the crash of a Cessna 172
aircraft with United States registration N6238D (the "accident aircraft") which caused severe
physical and emotional injuries to Plaintiff Arrin Farrar.

1

2.     The problem that severely injured Mr. Farrar, a seat slip, has killed and injured dozens of other pilots and passengers and Cessna has known about the defect for years but has refused to fix the problem.

3.     Multiple juries have penalized Cessna hundreds of millions of dollars for its outrageous and shocking conduct yet Cessna has refused to fix the problem.

***Parties***

4.     Plaintiff Arrin Farrar is an individual and resident of Maine with an address of 72 Rutland Road, Plymouth, Maine.  Arrin Farrar was a passenger injured in the aircraft accident which underlies this action.

5.     Plaintiff Erin Farrar is an individual and resident of Maine with an address of 72 Rutland Road, Plymouth, Maine.  At all times material, Erin Farrar was and is the spouse of Arrin Farrar.

6.     Defendant Cessna Aircraft Company is believed and therefore alleged to be a business entity organized and existing under the laws of the State of Kansas, with its principal place of business located at One Cessna Boulevard, Wichita, Kansas.  Defendant Cessna Aircraft Company is the subsidiary and agent of defendant Textron Aviation, Inc., as well as the manufacturer, designer and type certificate holder for the accident aircraft.

7.     Defendant Textron Aviation Inc. is believed and therefore alleged to be a business entity organized and existing under the laws of the State of Kansas, with a principal place of business located at One Cessna Boulevard, Wichita, Kansas.  Textron Aviation Inc. is the parent company of Cessna Aircraft, does direct its operations and financial matters, and is an agent of Cessna Aircraft.

2

8.     Defendants Cessna Aircraft Company and Textron Aviation, Inc. are referred to herein collectively as the "Cessna defendants" or "Cessna"

9.     Defendant McFarlane Aviation, Inc. ("McFarlane") is a business entity organized and existing under the laws of the State of Kansas with a principal place of business located at 696 East 1700 Road, Baldwin City, Kansas 66006.

10.    Defendant Andrew Swepston is an individual and resident of the State of Ohio residing at 312 Airport Road, Gallipolis, OH 45631.

## *Jurisdiction and Venue*

11.    All defendants maintain sufficient minimum contacts with the State of West Virginia to satisfy Due Process, substantial justice, and fairness concerns and justify the exercise of general and specific personal jurisdiction.

12.    Defendant McFarlane      is subject to personal jurisdiction within this state as it directed sales of products for use in the accident aircraft here.

13.    The defendants are each subject to specific jurisdiction in this state as harm occurred here, they sold products used on the accident aircraft here, and provided instructions and support related to the accident aircraft here.

14.    Specific jurisdiction is proper under the West Virginia long arm statute over the defendants.

15.    Venue is proper before this Court as the accident occurred within this District.

## *Background of the Cessna Seat Slip Accidents*

16.    The Cessna Defendants are manufacturers of a multitude of aircraft, which include small single engine sport aircraft to large, multi-engine jets.

3

17.     Cessna conducts business in West Virginia by selling aircraft, shipping parts, selling service information, soliciting sales factory direct, authorizing and licensing flight schools and service and sales centers, and continuously advertising for West Virginian consumers by making direct mail advertisements, internet solicitations and sending aircraft, pilots, mechanics and sales people into this State for sales demonstrations and service work.

18.     Since the 1940's Cessna has built single engine aircraft equipped with adjustable pilot seats, including left and right pilot seats.

19.     The adjustments in seats consist of a mechanism with two rails for each pilot seat that are part of the aircraft floor structure, called seat rails.

20.     The seat rails are made of aluminum or a similar metal or alloy (hereafter "aluminum") and the seats themselves slide on the rails on small nylon rollers.

21.     The seats are latched in place by a pin made of steel or similar metal or alloy (hereafter "steel") which penetrates small holes drilled on the top or sides of the aluminum rails.

22.     The steel pin is spring loaded to engage in the holes, which is supposed to lock the seat into the position selected by the pilot.

23.     Over the years, hundreds, if not thousands, of the pilot seats in Cessna aircraft suffered seat slips due to the steel pin ratcheting out of the hole, and on takeoff causing the seat to suddenly and unexpectedly rocket rearwards, killing some, maiming others.

24.     The vibration, acceleration and pitch-up of a propeller driven plane during takeoff is the most likely time that a seat will slip and also with the most disastrous results.

25.     Other seat slips have occurred on landing also because of the vibration and pitch-up.

26.     The design of the Cessna vertical pin seat locking mechanism is fundamentally flawed because it allows the seat pins to exit the locking holes.

27.     The design of the Cessna vertical pin seat locking mechanism is fundamentally flawed because the aluminum seat rails flex and move with the movement of the aircraft and the weight of the occupants.

28.     Pilots are taught to always keep their hands on the flight controls particularly during takeoff and landing.

29.     When the pilot's seat slides backwards, the grasping reflex does not allow the pilot to release the aircraft's flight controls before control of the aircraft is lost during this critical phase of flight.

30.     The pilot's grasping reflex combined with the rocketing of the seat backward in the aircraft causes the flight control yoke to move backward suddenly, which in turn causes the aircraft to pitch up suddenly then pitch down.

31.     Various ineffective methods of vertical pin seat locking mechanism modifications have evolved from Cessna over the years, including the addition of a second steel pin, the addition of springs, the changed of the shape of the pin ends, articulation of the pins, the depths of the holes in the seat rails, that addition of inertial wheels and the addition of seat stops.

32.     None of the modifications were effective because of the two basic design flaws, which is that the seat rails are aluminum and the pins are steel and there is a vertical engagement of the pins in the holes.

33.     The first basic design flaw is that steel pins are not compatible with the aluminum rails and the pins can ratchet out of the hole allowing the seat to slip.

34.     The second basic design flaw is that the pin inserts from the top of the rail, thus and aircraft vibration, vertical movement, bouncing while taxiing, bouncing on takeoff, wear on the seat retention legs, wear on the seat rollers, wear on the pin, dust, dirt, debris and flexion in the seat, seat rail or floor can cause the minimum insertion depth of the pin required for retention to be lost.

35.     In addition to the modifications above, Cessna also began installing more robust seat structures in the left-hand pilot seat to try and combat the propensity of the seats to slide back.

36.     This modification did not rectify the issue, and in the case where the pilot flying the aircraft is in the right seat, as is commonly the case in primary flight instruction, this modification provided little improvement in safety.

37.     In 1984, the case of Guarnere v. Cessna was tried against Cessna for injuries and deaths resulting from a seat slip at Cape May, New Jersey in 1980.

38.     In 1984 a jury in Camden, New Jersey awarded $25 million in punitive damages so Cessna would fix the seat latching mechanism.

39.     In 2001, the case of Cassout v. Cessna was tried against Cessna for injuries and deaths resulting from a seat slip at Pensacola, Florida in 1989.

40.     In 2001 a jury in Pensacola, Florida, awarded $400 million in punitive damages so Cessna would fix the seat latching mechanism.

41.     While there were at least thirty eight (38) Cessna plane crashes involving seat slips before the Cassout verdict, there have been more after the verdict.

42.     Cessna has not fixed the problem.

43.     On August 19, 2002 a Cessna model 172 aircraft crashed near Buffalo City, Wisconsin and the pilot reported that "[o]n takeoff, after applying full power and rolling for about 20 to 30 feet, the seat slid back to full aft preventing me from reaching the rudder pedals."

44.     On July 17, 2003 a Cessna model 172 aircraft crashed near Denver, Colorado and the NTSB reported that "[d]uring the takeoff roll, the flight instructor's seat reportedly travelled backwards."

45.     On October 19, 2003 a Cessna model 170 aircraft crashed near San Diego, California and the pilot told the NTSB investigator that as he flared for landing, the tail wheel touched the runway and he heard a "click." At that time the seat slid backwards about 1 foot, restricting his ability to reach the controls.

46.     On January 3, 2004 a Cessna model 182 aircraft crashed near Taylorsville, North Carolina and the NTSB reported that the "pilot stated he started his takeoff roll on the west runway, and just before rotation his seat slid backwards. The pilot reported that he 'lost directional control' of the airplane, and the airplane subsequently collided with an embankment."

47.     On September 28 2005, a Cessna model P210 crashed near Salmon, Idaho during takeoff when at the moment of rotation, the aircraft suddenly and violently pitched up associated with a seat slip of the pilot's seat which caused an aerodynamic stall and impact.

48.     On October 21, 2005 a Cessna model 172 aircraft crashed near West Milford, New Jersey, the "pilot initiated the takeoff roll, and as the airplane accelerated, the pilot's seat slick [sic] back to its most aft limit."

49.     On June 4, 2006 a Cessna model 180 aircraft crashed near Marina, California, the "pilot's seat slid aft during the takeoff roll" the pilot "was unable to reach the controls to maintain control of the airplane."

50.     On January 19, 2007 a Cessna model 182 aircraft crashed near Ashland, Virginia when, during a takeoff "just after the airplane had lifted off the runway, the pilot's seat slipped all the way to the rear stops."

51.     On September 22, 2007 a Cessna model 180 airplane crashed near Whittier, Alaska and the pilot was killed though "it is likely that the pilot's seat moved aft during the takeoff run, making it difficult for him to properly operate the airplane's controls."

52.     On June 25, 2008 a Cessna model 172 airplane crashed near Toms River, New Jersey when the certified flight instructor's seat rolled backward and "he instinctively reached for the control yoke."  The airplane yawed to the left, the left wing struck the ground, and the airplane flipped over.

53.     Cessna issued a number of service bulletins which did not affect the basic flawed design of the seat, but required inspections to determine the likelihood of seat slips and the means, in Cessna's view, of correcting them before the seats slipped.

54.     In June of 2011 the FAA used information from Cessna to issue an "Airworthiness Directive" which mandated that Cessna airplane seat rails be inspected more frequently, but inspecting the seat rails did not fix the problem either.

55.     Cessna never told the FAA or pilots that there was a fix available but instead withheld and/or knowingly concealed this information and instead insisted that repeated inspections and maintenance were a fix when Cessna knew that inspections were not a fix.

56.     The methods of inspection and recommended maintenance were all designed to sell replacement seat rails and seat parts, but did not and were never intended to fix the problem of a fundamentally bad design.

57.     Even after the June, 2011 Airworthiness Directive, the seat slips continued.

58.     On October 20, 2011 a Cessna model 182 aircraft crashed near Branson West, Missouri, the "pilot reported that the pilot seat released and slid rearward during the takeoff roll."

59.     On June 23, 2014 a Cessna model 172 aircraft crashed near Miami, Florida when, during the landing flare the pilot's seat slid aft.

60.     On October 19, 2014 a Cessna model 172 aircraft crashed near Xenia, Ohio, the pilot reported that during takeoff "his seat unexpectedly moved rearward" and "the pilot inadvertently applied aft yoke and his feet came off the rudder pedals, which resulted in a loss of directional control."

61.     On June 6, 2015 a Cessna model 180 aircraft crashed near Waterloo, Iowa, the "pilot reported that during the takeoff roll, the seat slid to its full aft position. He was unable to reach the control pedals and attempted to abort the takeoff."

62.     The crash that gives rise to this litigation occurred on March 26, 2016.

63.     Meanwhile, back in 1987, Cessna certified a single engine aircraft, the Cessna Caravan, which incorporated some of the recommended changes in seat latching design that the plaintiffs' experts in the Guarnere case had offered.

64.     The Cessna Caravan aircraft, certified in 1987, incorporated a much improved and infinitely more reliable seat design.

65.     None of the changes in the seat latch mechanism incorporated into the Cessna Caravan were made available to Cessna's existing aircraft designs already in the field, although similar change was introduced in the late models of certain Cessna aircraft.

66.     In the late 1980's, Cessna approved a band-aid fix for the seat slip problem in the form of a secondary seat latch, the purpose of which was to catch the seat as it rocketed aft and

stop it before the distance traveled allowed for the grasping reflex to cause the pilot to pitch the aircraft up.

67.     That modification was insufficiently tested and badly designed, such that a seat striking the cover of the mechanism would cause it to move and release the secondary latch, making it useless.

68.     Instead of attaching the secondary seat stop mechanism to all inboard seat rail replacements, Cessna chose instead to sell it separately, which then required a removal of the seat rails from the cabin floor, attachment of the secondary seat latch, and replacement of the rails.

69.     The very effort of removing and replacing the rails caused damage and bending of the structure and permitted the rails, which were unsuitable for serving the dual role of seat track and floor support, to end and be even less reliable for securing the seat.

70.     In 1996, Cessna introduced several single engine airplane models that incorporated a seat latching design similar to the Caravan of ten years earlier, but Cessna never made any of those life-saving design changes available as a retrofit for the tens of thousands of Cessna aircraft in the field.

71.     Cessna also failed to learn its lesson from Guarnere and from Cassout in that it failed to incorporate either steel inserts in the aluminum rail, to prevent ramping, or making the real itself from steel, either of which would have helped reduce the frequency of both rail replacement and failure.

72.     Cessna did not take these salutary design changes because repeated inspection and replacement of the defectively designed and built seat rails is a hundred million dollar profit center for Cessna and for McFarlane, which manufactures the defective rails.

73.     Since <u>Guarnere</u> and <u>Cassout</u>, Cessna has continued to misrepresent facts to aircraft owners, operators, pilots and the FAA because Cessna knows that its recommendations for seat rail inspection and replacement does not make the defect any safer but it does increase Cessna's profits through part sales.

74.     Since <u>Guarnere</u> and <u>Cassout</u>, Cessna still has failed to implement any changes that would prevent either the rails from bending or releasing the seat latching pin.

75.     Since <u>Guarnere</u> and <u>Cassout</u>, Cessna still has failed to implement any changes that would fix the secondary seat latch so it will serve its intended purpose.

76.     Since <u>Guarnere</u> and <u>Cassout</u>, Cessna has continued to misrepresent facts to aircraft owners, operators, pilots and the FAA because Cessna knows that its instructions to pilots to attempt to ensure that the defective seat is latched makes the problem worse because it accelerates the wear of the defective parts.

77.     Cessna's recommendations about ensuring seat latching of the defective seats causes premature wear to the defective parts, which causes more failures.

78.     Cessna's recommendations for repeated inspections do not solve the problem of the defective design but they do result in more defective replacement parts being sold by Cessna and others.

79.     McFarlane manufactures seat rails and other components for use in Cessna aircraft.

80.     McFarlane's rails are touted to be more robust than the original Cessna rails, but utilize the same flawed design.

81.     McFarlane allows the use of its products with the defective Cessna pin and latch design.

82.     As a result, even with the McFarlane rails and components, the accidents continue to occur.

### *Factual Background of This Crash*

83.     On March 26, 2016 Plaintiff Arrin Farrar was a student pilot and he intended to receive flight instruction and training in the accident aircraft near Charleston, West Virginia.

84.     Plaintiff Arrin Farrar's flight instructor that day was Brenda Jackson, who was fully certified and qualified to be the pilot in command of the accident aircraft.

85.     Plaintiff Arrin Farrar, a student pilot, was neither certified nor qualified to be the pilot in command of the accident aircraft.

86.     The weather was clear, the flight was being conducted in Visual Meteorological Conditions under Visual Flight Rules.

87.     In order to conduct flight training the accident aircraft was equipped with two sets of flight controls, one set of flight controls for the left pilot seat and one set of flight controls for the right pilot seat.

88.     Arrin Farrar sat in the left seat, and his certified flight instructor, Brenda Jackson, sat in the right seat.

89.     The accident aircraft was cleared for takeoff, which was accomplished by flight instructor Brenda Jackson from the right seat of the plane.

90.     Upon being cleared for takeoff Brenda Jackson applied full power to the propeller-driven accident aircraft which increased vibration in the cockpit.

91.     During the acceleration of the aircraft down the runway the seat pins holding Brenda Jackson's seat in place failed to remain engaged and, as a result, Brenda Jackson's seat slipped and slid rapidly toward the back of the aircraft on the seat rails.

92.     Due to the involuntary human grasping reflex, Brenda Jackson held the accident aircraft's control yoke as her seat rocketed backwards, causing the control yoke to move backwards as well.

93.     When the control yoke of an aircraft moves backwards, the aircraft pitches up and this is what happened to the accident aircraft.

94.     The yaw, or side-to-side movement of the aircraft's nose, is controlled in cockpit by rudder pedals.

95.     In order to use the rudder pedals, the pilot's feet must be able to reach them.

96.     When Brenda Jackson's seat rocketed backwards, her feet were not able to reach the rudder pedals and she was not able to control the yaw of the aircraft.

97.     After her seat slid backwards, the accident aircraft pitched up and yawed, the result was an uncontrolled and uncontrollable aircraft that crashed adjacent to the takeoff runway.

### *Damages*

98.     Plaintiff Arrin Farrar was severely injured in the crash and he brings this personal injury action against the Cessna Defendants and McFarlane.

99.     Plaintiff Arrin Farrar's leg was trapped in the wreckage, resulting in numerous breaks to it and injuries which almost required amputation.

100.    After the accident Plaintiff Arrin Farrar was transported to Charleston Area Medical Center where he was treated for right femoral neck fracture, right tibial plateau fracture, right comminuted fracture of the medial femoral condyle, proximal fibular mid shaft comminuted as well as a mid-shaft comminuted femur fracture, left patellar fracture, fracture of

the left little and ring finger metacarpal bones, vascular injuries to the right lower extremity requiring and exploration and repair, fasciotomies.

101.    Mr. Farrar also sustained facial lacerations with avulsive injury to the lower lip, skin grafting to the right lower extremity, as well as two days of post-traumatic amnesia and concussion.  Mr. Farrar spent several weeks in Charleston Medical Center Rehab undergoing occupational therapy for upper extremity function, activities of daily living, and cognitive perceptual skills along with physical therapy for range of motion, strengthening, bed mobility, transfers to progress to gait, and wheelchair mobility.  He also took part in recreation therapy which included self-reliance skill group.

102.    As a result of these injuries to Mr. Farrar, his spouse Erin Farrar suffered damages including lost wages, loss of consortium and incurred expenses due to the severe injuries to Mr. Farrar. She also incurred damages and losses due to Mr. Farrar inability to perform household services.

**COUNT I**
**(STRICT LIABILITY)**
***Plaintiffs v. The Cessna Defendants and McFarlane***

103.    Plaintiffs incorporate all previous and subsequent paragraphs of this Complaint as though set forth at length herein.

104.    All defendants are in the business of designing, manufacturing, testing, certifying, distributing, selling, supplying and/or providing aircraft and aircraft component parts.

105.    All defendants designed, manufactured, tested, certified, distributed, sold, supplied and/or provided the defective and unreasonably dangerous accident aircraft and its component parts including the pilot seats, pilot seat latching mechanisms, pilot seat rails, and other associated components and hardware.

106.    The dangerous defects which caused this accident existed at the time the accident aircraft and its component parts were first sold.

107.    The accident aircraft and its component parts were in substantially the same condition at the time of the accident as when first sold.

108.    The defects which rendered the aircraft unreasonably dangerous and defective were, but are not limited to, the following:

    a.    the seat latching system was defective because it failed to secure the seat in place;

    b.    the seat rails lacked all features necessary for safety including side-latching mechanisms instead of top-latching mechanisms;

    c.    the seat latching system using top-latching mechanisms are prone to dirt, dust and debris which have caused seats to become unlatched;

    d.    the seat latching system using top-latching mechanisms are prone to unlatching due to aircraft, engine and propeller vibration;

    e.    the seat latching system using top-latching mechanisms are prone to unlatching due to ratcheting out of the adjustment pin;

    f.    the seat latching system used aluminum against steel which allows almost immediate ramping of adjustment holes;

    g.    the seat latching system used aluminum for the rails which causes flexion and cracking causing loss of pin insertion depth;

    h.    the seat latching system used the rails as part of the floor structure which puts unreasonably high loads on the rail and bends it causing loss of pin insertion depth;

    i.  the seat latching system lacks adequate instructions and warnings in service documents, which lead mechanics and aircraft owners into a false sense of understanding the problem;

    j.  the seat latching system lacks adequate warnings to pilots and mechanics of the inherent design and manufacturing flaws in the seat rails;

    k.  the seat latching system was not redesigned to incorporate side-inserting adjustment pins; and

    l.  seat rails even within prescribed limits do not reduce the danger of seat slippage.

  109. As a direct and/or proximate result of the defects in the seats and seat latching system, the flight instructor's seat slid backwards on takeoff causing this crash and Plaintiffs' damages.

  WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

**COUNT II**
(NEGLIGENCE)
*Plaintiffs v. The Cessna Defendants and McFarlane*

  110. Plaintiffs incorporate all previous and subsequent paragraphs of this Complaint as though set forth at length herein.

  111. All defendants owed duties to the plaintiffs and their actions and omissions caused the seat in the accident aircraft to slip, the accident airplane to crash, and plaintiffs' damages.

  112. The defendant's actions and omissions included but are not limited to:

     a.      knowing misrepresentation to the FAA, owners, operators, pilots and flight instructors that new seat rails did not reduce the danger of seat slippage;

     b.      concealment from the FAA, owners, operators, pilots and flight instructors that new seat rails did not reduce the danger of seat slippage;

     c.      withholding of information from the FAA, owners, operators, pilots and flight instructors that new seat rails did not reduce the danger of seat slippage;

     d.      knowing misrepresentation to the FAA, owners, operators, pilots and flight instructors that seat rails within prescribed tolerances did not reduce the danger of seat slippage;

     e.      concealment from the FAA, owners, operators, pilots and flight instructors that seat rails within prescribed tolerances did not reduce the danger of seat slippage;

     f.      withholding of information from the FAA, owners, operators, pilots and flight instructors that seat rails within prescribed tolerances did not reduce the danger of seat slippage;

     g.      failure to redesign the defective seat latching system;

     h.      failure to ensure that owners, operators, pilots and flight instructors were safe from seat slippage;

     i.      failure to tell owners, operators, pilots and flight instructors that, despite the service publications and airworthiness directives seat slippage was likely because the fundamental flaw of the vertical pins were never corrected;

     j.      failure to tell owners, operators, pilots and flight instructors that no amount of inspections would eliminate the likelihood that the seats would slip, causing catastrophe;

k.     failure to warn of defects in the seat latching system;

l.     failure to supply non-defective parts that were prone to induce seat slippage;

m.     failure to warn owners, operators, pilots and flight instructors that new rails did not eliminate the problem of defective pins;

n.     failure to provide adequate instructions for replacement of rails;

o.     failure to require replacement of all components in the seat latches; and

p.     other negligent acts which will be demonstrated at trial.

113.   As a direct and/or proximate result of the foregoing actions and omissions, the accident aircraft crashed causing Plaintiffs' injuries and damages.

114.   As a direct and proximate result of the Defendants' negligence and/or defective products, the Plaintiffs have suffered, and continues to suffer emotional injuries which were a direct result of the accident and foreseeable to the Defendants.

115.   Plaintiff suffered the aforementioned injuries and damages as a direct result from the sensory and contemporaneous observance of the accident and of the injuries to one another and make a claim for negligent infliction of emotional distress.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

### COUNT III
**(BREACH OF WARRANTIES)**
***Plaintiffs v. The Cessna Defendants and McFarlane***

116.   Plaintiffs incorporate all previous and subsequent paragraphs of this Complaint as though set forth at length herein.

117.    Defendants are now, and was at all times material hereto, merchants engaged in the business of designing, manufacturing, selling, supplying, supporting, integrating and assembling aircraft and aircraft component parts, including the accident aircraft seat assemblies and seat rails, as well as associated operation, repair, overhaul, installation and product support materials.

118.    Defendant described and advertised their goods for sale, including the accident seat assemblies, rails and components.  Such descriptions and advertisements included, but were not limited to, advertising brochures, instructions, manuals, specification sheets, order sheets, and other product statements.

119.    These descriptions and affirmations concerning the goods resulted in express warranties that the goods sold by the defendants were as described and safe for their intended use.

120.    These descriptions, representations, and affirmations resulted in oral and written express and implied warranties which regard accident seat assemblies, rails and components.

121.    Defendant expressly and impliedly warranted that the accident seat assemblies, rails and components were safe and fit for use.

122.    These descriptions, affirmations, and express warranties became part of the bases of the bargain of their sales and said warranties ran to Plaintiffs.

123.    Plaintiff Arrin Farrar further relied upon these warranties in operating and traveling in the accident aircraft.

124.    As a result of the sales activities of the Defendant, each and all of them, expressly and impliedly warranted that their individual goods were merchantable, fit for their ordinary purpose, properly labeled and packaged for sale and installation, and conformed to the promises

and affirmations of fact made on their containers and labels.  These implied warnings ran from Defendants to Plaintiff.

125.    As a result of the sales activities of the Defendants, each and all them impliedly warranted that their goods were fit for their particular purpose, and each and all knew that their skill and judgment would be relied upon and were, in fact, relied upon by the purchaser of their individual goods.  These implied warranties ran from Defendants to Plaintiffs.

126.    Because the Defendants are merchants as to its goods offered for sale, there arises as a result of the "course of dealings" and "usage of trade" an implied warranty that each of their individual goods are safe.  These implied warranties ran to the Plaintiffs.

127.    By selling defective goods, the Defendant breached its express warranties and the implied warranties of merchantability and fitness for particular purpose and the implied warranties arising from the course of dealings and usage of trade.

128.    The breaches of warranties included the following:

a.    Use of a seat latching system which failed to secure the seat in place;

b.    Use of seat rails which lacked all features necessary for safety including side-latching mechanisms instead of top-latching mechanisms;

c.    Use of seat latching system using top-latching mechanisms which are prone to unlatching or not positively engaging;

d.    Use of a seat latching system using top-latching mechanisms which are prone to unlatching due to ratcheting out of the adjustment pin;

e.    Use of a seat latching system used aluminum against steel which allows almost immediate ramping of adjustment holes;

     f.     Use of a seat latching system used aluminum for the rails which causes flexion and cracking causing loss of pin insertion depth;

     g.     Use of a seat latching system used the rails as part of the floor structure which puts unreasonably high loads on the rail and bends it causing loss of pin insertion depth;

     h.     Use of a seat latching system lacks adequate instructions and warnings in service documents, which lead mechanics and aircraft owners into a false sense of understanding the problem;

     i.     Use of rails and a seat latching system which lacks adequate warnings to pilots and mechanics of the inherent design and manufacturing flaws in the seat rails, pins, rollers and component parts;

     j.     Use of a seat latching system which did not to incorporate side-inserting adjustment pins; and

     k.     Use of seat rails and latching components which even within prescribed limits do not reduce the danger of seat slippage.

129.    As a direct and proximate result of the foregoing breaches, the accident aircraft lost power and crashed resulting in the above described injuries and damages to Plaintiff.

130.    As a direct and proximate result of the foregoing conduct, Plaintiff suffered the above damages as well as pre-impact fear, severe emotional distress, conscious pain and suffering, serious personal injuries, loss of services, aid and society, loss of consortium, pecuniary injuries and damages as well as loss of earnings. Plaintiff is entitled to recover compensatory damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

### COUNT IV
### (FRAUD)
### *Plaintiffs v. The Cessna Defendants and McFarlane*

131.   Plaintiffs incorporate all previous and subsequent paragraphs of this Complaint as though set forth at length herein.

132.   Defendants knowingly misrepresented that the seat assemblies, rails and components which equipped the accident aircraft were safe for use and non-defective.

133.   In addition, the defendants also failed to disclose the high probability that a dangerous condition would develop in this accident seat assemblies, rails and components, despite knowing the history of seat slips in the accident model and related model aircraft, and the dangers associated with a seat slip.

134.   The defendants made this misrepresentation knowingly, to entice customers to purchase their replacement and components parts, including the seat rails, rollers, claws and associated components.

135.   Notwithstanding the actual knowledge of the unreasonably dangerous nature of this the seat design, the defendant willfully failed to make corrections and modifications and failed to disclose to current and prospective owners of aircraft with seat systems of this design of its dangers.

136.   In fact, the Plaintiff, and operators, owners and passengers relied on the representation by the Defendants, and each of them, that the aircraft seat assemblies and components would be safe for flight.

137.   However, due to the fraud committed by each of Defendant in constructing, designing, manufacturing and marketing the accident seat, rails, latches and component parts as safe for flight when in fact it is not, the defendants caused Plaintiffs' injuries.

138.   If not for the Defendants misrepresentations, omissions and concealment, Plaintiff Arrin Farrar would not have flown in the accident aircraft and therefore would not have suffered their damages due to this seat slip.

139.   As a direct and proximate result of the foregoing conduct, Plaintiffs suffered the above damages as well as pre-impact fear, severe emotional distress, conscious pain and suffering, serious personal injuries, loss of services, aid and society, loss of consortium, pecuniary injuries and damages as well as loss of earnings.   Plaintiffs are entitled to recover compensatory damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

## COUNT V
### (RECKLESSNESS, OUTRAGEOUSNESS, WILLFUL AND WANTON CONDUCT)
### *Plaintiffs v. The Cessna Defendants and McFarlane*

140.   Plaintiffs incorporate all previous and subsequent paragraphs of this Complaint as though set forth at length herein.

141.   Defendants, and each and every one of them, knew that the failure to properly design, manufacture, inspect, maintain, and/or repair the accident aircraft seat assemblies, rails, pins, rollers and associated components, would inevitably result in a seat slip with the likelihood of serious personal injury or death.

142.   Notwithstanding the actual knowledge of the defects and deficiencies in the accident aircraft seat assemblies, rails, pins, rollers and associated components, Defendants recklessly, willfully, wantonly, and/or outrageously, and in dereliction of their responsibilities failed to correct said defects or warn of said defects and likelihood of serious personal injury and/or death.

143.   As a direct and proximate result of the foregoing conduct, Plaintiffs suffered the above damages as well as pre-impact fear, severe emotional distress, conscious pain and suffering, serious personal injuries, loss of services, aid and society, loss of consortium, pecuniary injuries and damages as well as loss of earnings.   Plaintiffs are entitled to recover compensatory damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

## COUNT VI
### (NEGLIGENCE)
### *Plaintiffs v. Defendant Swepston*

144.   Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

145.   Defendant Swepston conducted repetitive maintenance and inspections for the accident aircraft, signing it off as airworthy thereafter and had a duty to ensure it was in a condition safe for flight.

146.   The negligence this defendant was a contributing cause in the crash of the accident aircraft, and the resulting injuries, death, and Plaintiffs' damages and losses.

147.    Defendant had a duty to exercise reasonable care in regard to the maintenance, testing, troubleshooting, manufacture, installation, assembly, re-assembly, repair, inspection, and overhaul of the subject aircraft, its seats, rails and associated components, accessories, hardware and firmware.

148.    In addition to the duties imposed by common law, Defendant was subject to duties imposed by regulatory law.

149.    Defendant breached his duties and was negligent, grossly negligent, reckless, willful and/or wanton in that they, among other things:

a.    maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, occupant seats and rails and associated hardware and firmware in an improper and unsafe manner that caused the seat to slip;

b.    maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, its seats, rails and associated hardware and firmware in an improper and unsafe manner;

c.    maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, its seats, rails, pins, rollers and components, accessories, hardware and firmware and failed to properly inspect and test these following maintenance;

d.    maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, pilot seats, rails, pins and associated hardware and components in an improper and unsafe manner and failed and neglected to adequately warn Plaintiff of the defects therein;

   e. maintained, tested, troubleshot, manufactured, installed, assembled, re-assembled, repaired, inspected, and/or overhauled and returned to service the aircraft, seats and hardware and firmware in an improper and unsafe manner and failed and neglected to correct known defects in the aircraft's seats and mounting rails, hardware and firmware;

   f. carelessly, recklessly, and negligently failed to properly distribute and provide instructions for the safe operation of the aircraft seats;

   g. carelessly, recklessly, and negligently failed to identify all defects and deficiencies in the accident aircraft seats, rails and mounting hardware and to troubleshoot same and follow through with regard to making certain that the seats did not slip;

   h. carelessly, recklessly, and negligently failing to comply with applicable Federal Aviation Rules and Regulations; and

   i. Defendants were negligent in other respects to be shown at trial.

  150. As a direct and proximate result of the foregoing breach, Plaintiff's decedent suffered fatal injuries, and death.

  WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

**COUNT VII**
**(BREACH OF EXPRESS AND IMPLIED WARRANTIES)**
***Plaintiffs v. Defendant Swepston***

  151. Plaintiffs incorporate by reference the above paragraphs as though set forth at length herein.

152.    The defendant performed maintenance, inspections and engine maintenance on the accident aircraft, its seats rails, mounting hardware and/or its systems, components or assemblies.

153.    Defendant is now, and were at all times material hereto, a merchant engaged in the business of maintaining, testing, troubleshooting, manufacturing, installing, assembling, re-assembling, repairing, inspecting, overhauling, and/or selling aircraft, seats, rails and component parts.

154.    Defendants expressly and/or impliedly warranted that the aircraft, its seats, rails, pins, rollers and component parts and the maintenance and overhaul performed were free of material defects, done in a professional, competent, and workmanlike manner, and that the accident aircraft and its engines were safe for flight and that these warranties ran to Plaintiffs.

155.    Defendants warranted that the aircraft, its maintenance, the seats and associated components, overhaul techniques and practices and other systems would be of excellent quality, merchantable and fit for the particular purpose intended, that is, safe flight as an aircraft in all reasonably anticipatable conditions.

156.    At all times material hereto, Defendants breached their warranties of fitness and for merchantability in that the aircraft was not fit for flight conditions reasonably anticipatable for flight by such aircraft, and it was not merchantable in that it was not properly and safely equipped to fly.

157.    Defendants described and advertised the accident aircraft, goods and services for sale. Such descriptions and advertisements included, but were not limited to, advertising brochures, instructions, manuals, specification sheets, web-based information and other products, statements and representations.

158.    These descriptions, representations, and affirmations concerning the goods and services of Defendant resulted in express and/or implied warranties that the goods were as described and sold for their intended use.

159.    In addition, Defendant provided an express and implied warranty for the accident aircraft seats, rails, rollers and components.

160.    These warranties were relied upon and became a basis for the bargain at the time of the purchase of goods and services by the aircraft's current and former owners and operators.

161.    These descriptions, representations, affirmations and express and/or implied warranties became part of the basis of the bargain of their sale and these warranties ran to Plaintiffs.

162.    Defendants breached the warranties of fitness and merchantability because the aircraft was not fit for safe flight and the work performed fell below standards of professionalism and competence.

163.    As a direct result of the breach of warranty, and breach of warranty of repair, the aircraft crashed and Plaintiffs suffered the injuries detailed, herein.

WHEREFORE, Plaintiffs demand judgment against these defendants for all damages permitted by law, costs and interest as may be allowed by law, and requests trial by jury of all issues triable as a right by a jury.

Plaintiffs
By Counsel

Warren R. McGraw II
Warren R. McGraw II
McGRAW LAW OFFICES
Beckley, WV Office
Counsel for the Plaintiff
PO Box 279
Prosperity, WV  25909
(304) 252-1014
WV Bar ID # 5086